IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 25, 2016 at Knoxville

**STATE OF TENNESSEE v. JONATHON D. BROWN**

**Appeal from the Circuit Court for Robertson County**
**No. 74CC2-2014-CR-453  John H. Gasaway, III, Judge**
_____

**No. M2015-02457-CCA-R3-CD – Filed December 2, 2016**
_____

Jonathon D. Brown ("the Defendant") was convicted of aggravated rape, especially aggravated kidnapping, and theft of property over the value of $1,000 by a Robertson County jury. The trial court sentenced the Defendant as a career offender to sixty years for both the aggravated rape and especially aggravated kidnapping charges, and to twelve years for the theft charge. The trial court ordered the sentences to be served concurrently in the Department of Correction. On appeal, the Defendant argues that venue was improper in Robertson County and that the evidence as to identity was insufficient for a rational juror to find that the Defendant was the assailant beyond a reasonable doubt. After a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Roger E. Nell (on appeal), Clarksville, Tennessee and Collier W. Goodlett (at trial), Springfield, Tennessee, for the appellant, Jonathon D. Brown.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; John W. Carney, District Attorney General; and Jason White and John Finklea, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

On July 16, 2014, the Defendant was indicted by the Robertson County Grand Jury for two counts of aggravated rape on alternative theories, two counts of especially aggravated kidnapping on alternative theories, one count of especially aggravated burglary, and one count of theft of property over the value of $1,000. The especially aggravated burglary charge was dismissed prior to trial on the State's motion.

*Jury Trial*

At trial, Jason Ghee, a Drug Interdiction Officer for the 18th Judicial District Drug Task Force, testified that he was employed by the City of White House "to stop vehicles for valid traffic violations and try to disseminate if they are law-abiding citizens or if there is criminal activity afoot." On September 3, 2013, Officer Ghee was watching traffic drive north on I-65 and observed a green four-door Ford vehicle. Officer Ghee "initiated [his] emergency equipment" when he observed that the driver was not wearing a seatbelt and that the vehicle "crossed the lane of traffic twice." The green Ford vehicle exited I-65 onto Bethel Road and continued driving at speeds in "excess of ninety [miles per hour]." Eventually the vehicle "left the roadway" and crashed when it was unable to navigate a sharp turn in Bethel Road. After the vehicle crashed, Officer Ghee pulled into a nearby driveway and observed a black male wearing "[d]ark colored pants and [a] maroon shirt" exit the passenger side of the vehicle. Officer Ghee also saw another black male wearing "a white shirt and dark-colored pants and dark shoes" exit the vehicle and run in a southeasterly direction. Lastly, Officer Ghee observed a white female exit the car. The female and the male in the maroon shirt were apprehended within ten minutes of the crash. However, Officer Ghee was unable to apprehend the male in the white shirt, who Officer Ghee had observed driving the green Ford vehicle. Officer Ghee followed the man until the officer "came upon a large evergreen tree that [he] couldn't just run past without tactically clearing whether the person had a weapon or not . . . ." At that time, Officer Ghee informed the Millersville Police Department that he was in a "foot pursuit of a black male with dread locks wearing black pants and a white shirt." Officer Ghee noted that the victim's house was located in the direction where the male in the black pants and white shirt was traveling. Several hours after the green Ford crashed, Officer Ghee alerted Kentucky Highway Patrol Trooper David Hall to be on the lookout for "[a] dark colored Buick that [was] possibly headed towards Bowling Green."

Jerome Inmon testified that on September 3, 2013, he was driving from Nashville to Bowling Green, Kentucky with "a white girl and [his] cousin." Mr. Inmon did not know his cousin's name but referred to him as "Curly." Mr. Inmon identified the

Defendant as "Curly" and stated that he was not actually related to the Defendant. Mr. Inmon stated that the Defendant was driving the green Ford vehicle on September 3 on I-65 when they were "spotted" by two police officers near Bethel Road. When the police officers initiated a traffic stop, the Defendant did not stop the vehicle because both Mr. Inmon and the Defendant believed that there were warrants out for their arrests. Mr. Inmon testified that the police chased them down Bethel Road until the green Ford vehicle hit a pole and the occupants jumped out and ran away. Mr. Inmon testified that he and the Defendant ran in different directions but that the police detained and arrested him. Mr. Inmon stated that he had criminal charges pending in Davidson County and had "a hold out of Kentucky" but that he did not accept any "deal" for testifying against the Defendant. Mr. Inmon stated that neither he nor the Defendant had ever previously been in the area of the car crash.

Next, H.N.[1] testified that she had lived on Bethel Road in Robertson County for approximately forty-five years with her children and now-deceased husband. On September 3, 2013, H.N. drove to Goodlettsville to "run a few errands" and returned home by noon. When she arrived home, H.N. pulled her car into the garage located in the basement of her house. H.N. walked outside of the basement and filled up her lawnmower with gas. As she got on the lawnmower, a man "jumped out" from behind two of H.N.'s other vehicles parked next to the lawnmower. H.N. got off the lawnmower and tried to run away from the assailant, but "he came up behind [her] and stopped [her]" by holding a knife to her neck. H.N. testified that she tried to alert her neighbors by saying "help," but the assailant "pushed [her] back into the basement." The assailant told H.N. to be quiet, took her cars keys from her pants, and asked H.N. if she had any money. H.N. initially replied that she did not, but she then remembered she had placed two fifty-dollar bills in the trunk of her car. H.N. retrieved the two fifty-dollar bills from her car trunk and gave them to the assailant. Then the assailant got into the car and briefly turned on the ignition. By this time, the assailant had shut the garage door. The assailant also took off his shirt, opened the "passenger side door," and tossed his shirt into the car. He told H.N. that "he bet [she] had money upstairs." H.N. told the assailant that the door from the basement to the house was locked and that she did not have the key. However, H.N. had laid her house keys in the tray of an old dishwasher in the basement before leaving to run errands that morning. The assailant attempted to get into the house by climbing the steps and bringing H.N. up the steps, but H.N. told the assailant that she was locked out of her house and that her children were bringing her keys to the house around 3:30 p.m.

After he was unable to get into the house, the assailant came back down the steps and pushed H.N. against the vehicle while standing behind her. The man "unzipped [her]

---

[1] It is the policy of this court to refer to the victims of sexual assault only by their initials.

blue[ ]jeans and pulled them down." The assailant then pushed H.N. "around to the hood of the car" as H.N. said "I am so old, please don't do this to me." The assailant responded that her age did not matter. H.N. then felt the assailant penetrate her vagina with his penis several times, causing her pain. Additionally, the assailant put a garbage bag in her mouth to gag her. The assailant then pulled up his pants and H.N.'s pants, pushed her over to a "yard chair" in the basement, and tied her to the chair while she was still gagged with the garbage bag. H.N. recalled that the assailant used ski ropes hanging on the walls of the garage to tie each of her arms and legs to the chair, and he used "binder twine" to tie her waist to the chair. As the assailant "was getting ready to leave," H.N. was able to see his face. H.N. saw that the assailant was a black male with a short, stocky build and that his hair was in dreadlocks. However, H.N. was unable to positively identify the Defendant as the assailant at trial.

H.N. testified that, after the assailant tied her to the chair, he took a bottle of water and some rubber gloves that she had worn earlier that day to pull weeds. H.N. stated that the assailant put the gloves on before he left in her vehicle. H.N. testified that, before the assailant took her car, there were no gloves or knives in the vehicle.

After the assailant left in her vehicle, H.N. was able to free her hands, move over to a phone on the garage wall, and call her son, daughter, and son-in-law. After her family members arrived, they helped H.N. to free herself from the chair and called the police. Family members gave the police the license plate number of H.N.'s stolen car and took H.N. to the hospital. H.N. testified that the assailant gave her a small cut on her cheek with his knife and that she sustained bruising on her wrists from being tied to the chair. Additionally, H.N. stated that her vaginal area was "hurting really bad" following the assault. At the hospital, the emergency room doctor examined H.N. and performed a "rape kit." While she was at the hospital, H.N. became nauseous. The doctor performed an arteriogram on H.N. and determined that she had suffered a "stress related heart attack." On cross-examination, H.N. noted that she did not have any blockages in her heart and that she does not take any medications.

Cynthia Elder testified that on September 3, 2013, she was leaving her house for work when she noticed that she had missed a call from her mother, H.N. On her way to her car, Ms. Elder received a call from her husband, and she then drove to H.N.'s home. Once she arrived at H.N.'s house, Ms. Elder saw that H.N. "was sitting at the back of the basement next to the wall in a yard chair tied up." Ms. Elder saw that H.N.'s arms, legs, and waist were tied to the chair but that H.N. had loosened the restraints around her arms. Ms. Elder called the police and noticed that H.N.'s car was missing from the garage. The missing car was a black 1990 Buick Regal with a "Titans mirrored license plate" on the front of the car. After the police arrived, Ms. Elder, her uncle, and her brother cut the

rope around H.N.'s waist and took her to the hospital.  Ms. Elder testified that H.N.'s car was later found, and Ms. Elder and her husband sold the car for H.N. for $1,800.

Dr. Duane Harrison testified that he had been an emergency room physician for thirty-one years and had worked at the Hendersonville Medical Center for twenty-four years.  After the trial court declared him an expert in emergency medicine, Dr. Harrison testified that he was working in the emergency room on September 3, 2013, and examined H.N.  Dr. Harrison testified that H.N. stated that "she went out to mow her grass and someone attacked her," raped her, and held a knife to her throat.  During his examination of H.N., Dr. Harrison noted that the bruises around her wrists "looked like constriction marks . . . ."  Dr. Harrison stated that the bruises were fresh and were consistent with being "held or tied up . . . ."  Dr. Harrison also performed "an in-depth vaginal exam" and found "[e]xternal bruising on [H.N.'s] external vagina."  Dr. Harrison also found that H.N. "had tearing on the right external lip[,] . . . bruising on both lips[,] . . ." and bruising on her clitoral hood.  Dr. Harrison testified that this bruising and tearing was consistent with "some type of trauma" and penetration.  Dr. Harrison noted that the bruising would have been caused by "a violent act" that was consistent with "repeated penetration."  Additionally, Dr. Harrison stated that due to H.N.'s age, ". . . if the act is just done in a violent manner, then she has dry thin tissue from being seventy-two years of age and it is torn if she is penetrated violently[,]" which would cause pain.

After taking a specimen from H.N.'s vaginal area, Dr. Harrison gave H.N. two different medications for nausea.  When H.N. continued to feel nauseous, Dr. Harrison gave her "an anxiolytic," but H.N.'s blood pressure began to drop so he admitted her to the hospital overnight.  H.N. was taken to the critical care unit, where the hospital staff "drew cardiac enzymes to determine whether or not something was wrong with her heart."  Dr. Harrison found that H.N. had suffered a heart attack due to the stress of the earlier events.  Dr. Harrison testified that these types of heart attacks are life-threatening and could cause organ failure.

Kathy Cormier testified that she was a registered nurse employed at Hendersonville Medical Center.  On September 3, 2013, Ms. Cormier assisted Dr. Harrison in examining H.N. and processing a rape kit.  Ms. Cormier testified that she assisted by "removing [H.N.'s] clothing in a specified way, packing her clothing, drawing blood, packaging her blood and sealing everything, [and] obtaining pubic hairs[.]"

David Hall testified that he was a K-9 Trooper with the Kentucky State Police.  On September 3, 2013, Trooper Hall was on patrol with Officer Jeremy Duvall when Officer Ghee contacted him.  Based on the call from Officer Ghee, Trooper Hall began looking for a stolen "black '90s Buick" with a Tennessee Titans personalized plate.  Trooper Hall drove to "the area of Gordon Avenue and Veterans' Memorial in Bowling Green,

Kentucky" with Officer Duvall. Officer Duvall parked at the intersection of Veterans' Memorial and Gordon Avenue "facing a Junior Food Store" while Trooper Hall drove around the area.

After approximately ten minutes, Officer Duvall contacted Trooper Hall on the radio. Trooper Hall arrived at the Junior Food Store and saw a car matching the description of the stolen vehicle. Trooper Hall "set up surveillance," and the Defendant came out of the Junior Food Store and began to walk towards the stolen vehicle. However, when a "marked Bowling Green police cruiser" pulled into the parking lot for an unrelated reason, the Defendant "turned around and walked back into the store." At that point, Trooper Hall "ran into the store and immediately detained [the Defendant]." When Trooper Hall entered the store, the Defendant was lying in a "prone position in the floor of the Junior Food Store." Trooper Hall placed the Defendant in handcuffs and walked with him outside to the stolen vehicle. Trooper Hall then "patted [the Defendant] down for weapons and searched his pockets." Trooper Hall found "various change and currency[,]" "a small amount of marijuana[,]" and "car keys that appeared to go to [the stolen vehicle]." After Trooper Hall informed the Defendant of his Miranda rights, the Defendant agreed to speak with Trooper Hall and "stated that he had just bought the vehicle approximately one hour ago." However, the Defendant could not tell Trooper Hall the seller's name, and he "stated he technically did not buy it legally . . . ."

Officer Jeremy Duvall testified that he was a patrol officer for the Kentucky State Police and assisted Trooper Hall with locating a stolen vehicle on September 3, 2013. Officer Duvall testified that he had received an alert bulletin from Tennessee authorities regarding a stolen car that stated that the vehicle was "a 1990 black Buick two-door, Tennessee license plate[] with a silver mirrored style Tennessee Titans front license plate." Officer Duvall stated that he parked his marked patrol car "at the intersection of Kentucky 185 and Veterans Avenue in Bowling Green . . . ." While he was parked at the intersection, Officer Duvall observed "a vehicle approaching [his] location with [a] silvered mirrored Tennessee Titans license plate . . . ." As the vehicle passed him, Officer Duvall noticed that the only occupant was "a single black male . . . with a hat turned backwards and a white shirt." Officer Duvall also noticed that the license plate on the vehicle matched the license plate of the stolen vehicle from the Tennessee alert bulletin. The vehicle pulled into the parking lot of the Junior Food Store and parked, and Officer Duvall contacted Trooper Hall. After Trooper Hall arrived, he and Officer Duvall walked towards the store. The Defendant exited the store but turned around and walked back towards the store when a marked patrol cruiser pulled into the parking lot. Trooper Hall then commanded the Defendant to stop. The Defendant entered the store, laid "on the ground with his hands up," and was handcuffed. After arresting the Defendant, Officer Duvall and Trooper Hall searched the Defendant and found an unopened pack of cigarettes and seventy-eight dollars in the Defendant's pant pocket,

among other items. Officer Duvall noted that the Defendant was wearing blue jeans, a white, long-sleeved thermal shirt, and black shoes when he was arrested.

Lieutenant John Brown of the Millersville Police Department testified that on September 3, 2013, he went to H.N.'s home on Bethel Road to investigate the crime scene. After he arrived, Lieutenant Brown spoke with H.N. and photographed the scene. Lieutenant Brown photographed some footprints "located to the right side of the basement garage area." The photographs of the footprints were submitted to the Tennessee Bureau of Investigation (TBI) along with the Defendant's shoes. Lieutenant Brown testified that he also processed the scene for latent fingerprints and "found a fingerprint or partial print maybe off of one of the other vehicles that was parked in the carport area." After processing the scene, Lieutenant Brown went to the Hendersonville Medical Center to receive a "sexual assault evidence collection kit."

On September 4, 2013, Lieutenant Brown processed the outside of the stolen vehicle for latent prints and evidence. Lieutenant Brown found "a series of smear marks" on the hood of the car near the front passenger wheel well. Lieutenant Brown searched the inside of the car and found a pair of clear latex gloves "in the front passenger side floorboard." Lieutenant Brown also found a "white type of undershirt" and a "box cutter knife" in the floorboard of the front passenger seat. In November 2013, Lieutenant Brown obtained a sample of the Defendant's DNA under a search warrant issued by a Kentucky court.

Jennifer Spivey stated that she was a Special Agent Forensic Scientist in the Latent Print Unit of the TBI Nashville Crime Laboratory. After the trial court declared that Special Agent Spivey was an expert in latent print examination, she stated that she examined a knife related to the Defendant's case for latent prints. She did not find any latent prints on the knife but did find "handling" or ridges of a print. Special Agent Spivey also examined the latent print lifted by Lieutenant Brown, but she only found a few ridges and was unable to identify the latent print.

Mairanda Gaddes testified that she was a Special Agent Forensic Scientist in the Trace Evidence Unit of the TBI Forensic Services Division. After the trial court declared Special Agent Gaddes an expert in the examination of shoe prints, she stated that she examined the pair of boots worn by the Defendant and the photograph of the footprints on the floor of H.N.'s basement garage. Special Agent Gaddes testified that she was unable to properly compare the Defendant's shoes and the footprints in the photographs because "the wrong type of rule[r] was used." However, Special Agent Gaddes visually compared the tread of the Defendant's shoes with the footprints in the photograph, and stated that "they ha[d] a similar tread design." Special Agent Gaddes could not exclude the Defendant's shoe from being the shoe that created the footprint in the garage, but she

also could not state with certainty that the Defendant's shoes made the footprints in the photograph.

Charly Castelbuono testified that she was a Special Agent Forensic Scientist in the Forensic Biology Unit of the TBI. After the trial court declared Special Agent Castelbuono to be an expert in DNA analysis, she stated that she examined the sexual assault kit with samples from H.N. Special Agent Castelbuono testified that the kit contained a "known blood sample" from H.N. and buccal swabs from the Defendant. Special Agent Castelbuono used the Defendant's buccal swabs to obtain a DNA profile of the Defendant for comparison purposes. Special Agent Castelbuono stated that she tested the shirt found in H.N.'s car for DNA and found DNA around the collar and armpits of the shirt. The DNA contained a "full profile" but was a mixture of DNA from multiple individuals. The Defendant was a major contributor of the DNA.

Special Agent Castelbuono also examined the Defendant's underwear and found semen as well as non-semen DNA. Special Agent Castelbuono testified that the partial DNA profile from the semen DNA matched the Defendant. Additionally, Special Agent Castelbuono stated that the partial DNA profile obtained from the non-semen DNA was "consistent with a mixture of at least three individuals." Special Agent Castelbuono testified that H.N. could not be excluded as a contributor to the mixture of non-semen DNA. Special Agent Castelbuono examined the latex gloves found in H.N.'s car by swabbing the inside and the outside of the gloves. She found a partial DNA profile on the outside of the first glove that was "consistent with the mixture of at least two individuals." H.N. was a major contributor to this DNA profile. Special Agent Castelbuono testified that her analysis was inconclusive as to whether the Defendant was a minor contributor to the DNA profile on the outside of the first glove. Next, Special Agent Castelbuono stated that she found a partial DNA profile on the inside of the first glove that was consistent with a mixture of H.N.'s DNA and the Defendant's DNA. Special Agent Castelbuono testified that she found a partial DNA profile on the outside of the second glove that was consistent with a mixture of H.N.'s DNA and the Defendant's DNA. Lastly, Special Agent Castelbuono testified that she found a partial DNA profile on the inside of the second glove that was "consistent with a mixture of at least two individuals." Special Agent Castelbuono could not exclude either H.N. or the Defendant as a contributor to this DNA profile. Special Agent Castelbuono also tested the vaginal swab and H.N.'s underwear for semen but did not find any.

After the State rested its case, Chris Traughber testified that he was the property assessor for Robertson County. Mr. Traughber identified a property record card for H.N.'s residence on Bethel Road, and he noted that the card indicated that the property was located in Sumner County. Mr. Traugher also identified an aerial photograph and a "GIS map" of the portion of Bethel Road where H.N.'s residence was located. Mr.

Traughber noted that the area was located in Sumner County. Mr. Traughber testified that H.N. would have paid her property taxes to Robertson County because there was an agreement between Sumner County and Robertson County for the properties in that area to pay taxes to Robertson County. On cross-examination, Mr. Traughber agreed that his testimony was based on maps from his office and that he did not survey the area of Bethel Road where H.N.'s property was located.

In rebuttal, David Mark Palmer testified that he purchased H.N.'s property in September 2013. Mr. Palmer identified a certified copy of the warranty deed to the property and noted that the warranty deed was registered with the Robertson County Register of Deeds. Mr. Palmer also testified that the warranty deed reflected that the property was located in Robertson County. Mr. Palmer stated that he was registered to vote based on the address of the property in question and that he voted in Robertson County. Additionally, Mr. Palmer stated that he paid property taxes for the property in question to Robertson County. Lastly, Mr. Palmer testified that he changed the address on his driver's license to the property in question, and his driver's license was registered in Robertson County.

Ms. Elder was recalled and testified that she lived at the property in question on Bethel Road from the time she was in third grade until she was twenty-three years old. Ms. Elder testified that she attended Robertson County Schools from elementary through high school. Ms. Elder also noted that she registered her car in Robertson County and registered to vote in Robertson County.

The jury found the Defendant guilty of two counts of aggravated rape, two counts of especially aggravated kidnapping, and one count of theft of property over the value of $1,000.

*Sentencing Hearing*

At a sentencing hearing conducted August 11, 2015, the trial court sentenced the Defendant as a career offender to sixty years for the aggravated rape conviction, sixty years for the especially aggravated kidnapping conviction, and twelve years for the theft of property valued over $1,000 conviction. The trial court ordered the Defendant's sentences to be served concurrently in the Department of Correction for an effective sentence of sixty years with release eligibility after service of 100% of the sentence. The trial court merged the Defendant's two aggravated rape convictions and merged his two convictions for especially aggravated kidnapping, and the judgments reflect that count five was dismissed prior to trial.

*Motion for New Trial*

The Defendant filed a timely Motion for New Trial, arguing that the Defendant was prosecuted in an improper venue, the evidence was insufficient for conviction, and that the verdicts were against the weight of the evidence. Following a hearing, the trial court denied the Defendant's Motion for New Trial. This timely appeal followed.

## II. Analysis

*Improper Venue*

In this direct appeal, the Defendant argues that the State failed to prove by a preponderance of the evidence that H.N.'s rape and kidnapping were committed in Robertson County. The State responds that there was sufficient evidence for a rational juror to find by the preponderance of the evidence that venue was proper in Robertson County.

"Because Article 1, Section 9 of the Tennessee Constitution gives a person accused of a crime the right to have a jury trial in the county in which the crime was committed, venue is considered a jurisdictional fact in a criminal prosecution." Ellis v. Carlton, 986 S.W.2d 600, 601 (Tenn. Crim. App. 1998) (citing Harvey v. State, 376 S.W.2d 497, 498 (Tenn. 1964); Norris v. State, 155 S.W. 165 (Tenn. 1913)). "It has thus been stated that the jurisdiction of the trial court is limited to the crimes which occur within the territorial boundaries of the county in which it sits." Id. (citing State v. Hill, 847 S.W.2d 544, 545 (Tenn. Crim. App. 1992)); see also Tenn. R. Crim. P. 18(a). The State has the burden of proving venue by a preponderance of the evidence. Harvey, 376 S.W.2d at 498. Venue may be proven by direct or circumstantial evidence, and "the jury is entitled to draw reasonable inferences from the evidence." State v. Young, 196 S.W.3d 85, 101-02 (Tenn. 2006).

Here, the State produced sufficient evidence for the jury to find that the Defendant committed the crimes at issue in Robertson County. Mr. Palmer testified that the warranty deed he received after purchasing H.N.'s property states that the property is located in Robertson County. Mr. Palmer filed the warranty deed with the Robertson County Register of Deeds. Additionally, Mr. Palmer stated that he pays property taxes for the property to Robertson County. Ms. Elder testified that while she lived at the residence she attended school in Robertson County, registered her driver's license in Robertson County, and registered to vote in Robertson County. The jury found that the State proved that the crimes were committed in Robertson County by a preponderance of the evidence, and the evidence in the record does not preponderate against the jury's finding. See State v. Bobby Shellhouse, Jr., No. E2001-01604-CCA-R3-CD, 2002 WL

31202135, at *4 (Tenn. Crim. App. Oct. 3, 2002), perm. app. denied (Tenn. Feb. 18, 2003) (holding that the State proved by a preponderance of the evidence that the crime had been committed in Sevier County by testimony of the victim's mother and introducing a county road map).

*Sufficiency of the Evidence*

The Defendant also argues that the evidence was insufficient for a rational juror to find that the Defendant committed the crimes at issue. More specifically, the Defendant points out that "[H.N.] could not identify the perpetrator" at trial and that many of the items of evidence collected were either not tested or were inconclusive as to the Defendant's DNA. The State responds that the evidence was sufficient for a rational juror to find beyond a reasonable doubt that the Defendant committed the crimes at issue.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted). Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt. State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (citing Dorantes, 331 S.W.3d at 381). We must determine "whether the circumstantial evidence, when considered as equal in stature with direct evidence, is sufficient to have persuaded a rational jury, by the proper 'use [of] its experience with people and events in weighing the probabilities,' of the defendant's guilt beyond a reasonable doubt . . . ." Dorantes, 331 S.W.3d at 385 (quoting Holland v. United States, 348 U.S. 121, 139-40 (1954)).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

The identity of the perpetrator is "an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). Identity may be established with circumstantial evidence alone, and the "jury decides the weight to be given to circumstantial evidence, and [t]he inferences to be drawn from such evidence . . . ." Id. (internal quotation marks omitted). The question of identity is a question of fact left to the trier of fact to resolve. State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

As charged in this case, aggravated rape is a Class A felony that is defined as "unlawful sexual penetration of a victim by the defendant" when"[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[]" or when "[t]he defendant causes bodily injury to the victim[.]" Tenn. Code Ann. § 39-13-502(a)(1)-(2) (2015).

As relevant here, especially aggravated kidnapping is a Class A felony defined as "false imprisonment, as defined in § 39-13-302[]" that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[]" or "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305(a)(1), (4) (2015). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2015). Theft of property is "[a] Class D felony if the value of the property or services obtained is one thousand dollars ($1,000) or more but less than ten thousand dollars ($10,000)[.]" Tenn. Code Ann. § 39-14-105(a)(3).

When the evidence is viewed in the light most favorable to the State, there is sufficient evidence for a rational juror to find beyond a reasonable doubt that the Defendant committed aggravated rape, especially aggravated kidnapping, and theft of property against the victim, H.N. Both Mr. Inmon and Officer Ghee identified the Defendant as being the driver of the green Ford vehicle that fled from the police on I-65, exited onto Bethel Road, and crashed on Bethel Road. Additionally, both Mr. Inmon and Officer Ghee testified that the Defendant ran southeast, in the direction of H.N.'s property, and that the Defendant was not apprehended. H.N. testified that the assailant who raped her and tied her to a chair in her garage was a black male with a short, stocky build and dreadlocks. While H.N. did not identify the Defendant as her assailant at trial, her description of her assailant matched the Defendant's physical appearance. See State v. Michael Holmes, No. W2014-02437-CCA-R3-CD, 2016 WL 4521672, at *5 (Tenn.

Crim. App. Aug. 25, 2016) (concluding that the fact the victim was not able to identify the defendant as the shooter did not undermine the jury's determination in light of other evidence presented at trial), perm. app. filed. Additionally, H.N. testified that her assailant took a bottle of water and a pair of gloves from her garage before he left in her car. When the Defendant was apprehended, he was found with H.N.'s stolen vehicle, which contained a bottle of water and a pair of plastic gloves in the floorboard. H.N. testified that those items were not in her car before it was stolen. See State v. Brandon Leon Forbes, No. W2014-02073-CCA-R3-CD, 2015 WL 5813434, at *6 (Tenn. Crim. App. Oct. 5, 2015) (determining that the evidence was sufficient to establish the defendant's identity as the perpetrator when the defendant physically matched a witness's description of his assailant and items stolen from the victim were found in the defendant's possession), no perm. app. filed.

Moreover, when the plastic gloves were tested for DNA, Special Agent Castelbuono found DNA matching both the Defendant and H.N. on the inside and outside of the gloves. Although the Defendant argues that the results of DNA testing on the inside of the gloves were less than conclusive, the jury assigned weight to the DNA evidence collected from the items found in H.N.'s vehicle, and this court cannot reweigh that evidence. See State v. Lizandro Guevara, No. M2015-01719-CCA-R3-CD, 2016 WL 5266552, at * 5 (Tenn. Crim. App. Sept. 21, 2016) ("Although the DNA evidence was imperfect, it was still relevant and still tended to prove Defendant's identity as its contributor."), no perm. app. filed. Taken as a whole, the evidence was more than sufficient for a rational juror to find beyond a reasonable doubt that the Defendant was the perpetrator of H.N.'s rape and kidnapping and the theft of her vehicle. The Defendant is not entitled to relief.

## III. Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE